United States v. Aaron Smith Another clear case. Go ahead. Good morning, your honors. Good morning. My name is Mark Greenberg and I am counsel for Aaron Smith, the appellant. With the court's permission, I'd like to reserve three minutes of rebuttal time. That's granted. Your honor, I'd like to focus on the second issue in this case, and that is the government's impeachment. Yeah, that's a good choice. Of the defendant's alibi. The issue in this case was whether or not Aaron Smith was the smaller of the two robbers that robbed the Fox and the Hound on October the 27th, 2008 at 10 o'clock in the morning. Does that exist now? Do you happen to know? Fox and the Hound? It's still there. 15th and Spruce? 15th. I must pass it every week, and I don't think I ever sold it. Well, the Petco line is right next to it, so it's still there. And the question here is whether or not the government's impeachment and attack of Smith's alibi was permitted under Rule 404B. Mr. Smith presented three witnesses to establish his alibi. The first witness was Frank Guyon, who established about Kintock and about the security arrangements at Kintock and the circumstances about Mr. Smith signing out. Once again, let's work backwards for a second. Let's just assume that this was brought in as the show's bad character and there was a problem. But then was it harmless? Yes, that's the issue. And so let's assume for the moment there's a violation. You've got Hopkins. Oh, it's clearly a violation. Yeah. You have Hopkins' testimony, identification. Then you have Jenkins' identification. And the thing that Hopkins says, I didn't really know the guy's name. I just knew him. We call him A-dub. Well, as it turns out, this particular person has a tattoo, A-dub. And that would seem to be a pretty key piece of evidence. So how is this harmless error? It's harmless from identification to the significance of A-dub. With respect to the identification, you have three witnesses here who were involved in an identification procedure. That procedure, that original photographic array, took place over two years after the robbery took place. Mr. Jenkins, who is the cook, testified about the circumstances as to how he made that identification, face down on the floor with his head partially underneath the desk, telling the police who took his statement that day. And that's why I said the key piece. I didn't know the guy's name. We just called him A-dub. Let's talk about Mr. Hopkins. Mr. Hopkins was unable to make a definitive identification. But he was able to say, I knew that we called the guy A-dub. And what did he say about the significance of the name dub? Dub was a rap term that was used with respect to individuals. And he talked about another individual named E-dub, who he also knew. Did E-dub have a tattoo on his arm? That point is no. A-dub did. I understand that. But you're honing in on a legitimate point. Everybody keeps saying it's homing, by the way. I'm sorry. That's okay. I'm happy to correct you. You hone a knife or hone your skills, but it's homing. You're homing in on a reasonable question. And that is the significance of the A-dub tattoo on his arm. My position is that if that was unique to Aaron Smith, and unique to the rap community as a whole, then I can see your Honor's point. But where you have Mr. Hopkins acknowledging that dub is a term that is used in the rap community, and you have Mr. Hopkins acknowledging that there are other individuals that he knows as E-dub, then that sort of reduces and diminishes the impact of his testimony as to identification. I have other real problems myself with Hopkins' testimony. Sure. One of them is the fact that he admitted to lying to the grand jury. Beyond even that. And he has a motive to... But are we really here to discuss the 11 infractions that came in, and how your client was prejudiced by them, even if they were wrongly admitted? And as Judge Ambro put it, whether any error here was harmless. I think the question of prejudice is a harmless error. It's really where you want to be. We have to look at these infractions, which I thought is what we were really here to argue. Well, the infractions, and the thing that I think is most egregious here, is when the government fleshed out on Appendix 533 and 534, conclusions made by the records in Kintock that Mr. Smith had below average level of compliance, or that he had an inability to comply with the majority of rules and regulations. Why is that egregious? Because it casts a judgment on the type of individual that Aaron Smith is. We're not talking about individual infractions like a cell phone where the government could argue, well, if he had a cell phone on one occasion, then theoretically he had the opportunity to have a cell phone on another occasion and make phone calls and coordinate stuff like that. I understand that. But when you have basically records that contain conclusions that besmirch Mr. Smith's character, and I don't know how else you can characterize a statement of below average inability to follow rules. Bad guy. He's a bad guy. But they're saying, the government is saying, and I have a few questions for them, that this evidence came in to show motive, an opportunity. I think they say, and I'll try to get this a little more clearer than it is in my mind, I think they're saying, you know, opportunity to, again, violate the rules. But it's opportunity to commit the robbery of the tavern on October 27th. And I wonder how any of these infractions are the least bit probative or relevant to that. That's my point exactly in the brief, and that is the issue with respect to the alibi. Was Aaron Smith at the Fox and the Hound on that particular day, or was he at Connections at the training center on that particular day? These other things had nothing to do with his whereabouts on October the 27th. And even if you assume, Your Honor, that half of the infractions might have been relevant at some point, in some fact here. At smoking? Obviously. But even that's relatively minor. Okay, so I'm not going to say that particular infraction is going to turn the tide of the case against Aaron Smith. But when you're talking about basic characterizations of what kind of person he is, as Your Honor has pointed out, he's a bad guy, that's the whole point about 404B. He has a right not to be judged. You mean he has a right to be bad? Well, I guess he has a right to be bad, but not a right to be judged because he's bad. Especially when he gets 30 years. Let's hone in more precisely on the two of the 11 infractions that probably are most applicable here. His unauthorized leavings of where he's supposed to be. Now, the judge permitted the government to present evidence that Smith had left before. So there's no reason he couldn't have left on October 27th. But the two times that he left without authorization were after the robbery on October 27th. One was in November, the following month, and one for which there was an incident report alone, and the other one was in February, and he was discharged. So they were after the fact. They could not have been used under the court's ruling, Appendix 8, could not have been used. That's a plus for you. I understand that, but not only that, but that evidence was that he left from Kintock and not Connections, which is where he was supposed to be on October the 27th. So not only are you right from the standpoint of temporal relevance, but you're also right on, Your Honor, with respect to the logical connection between him leaving a different location and whether or not he left or was present at the location at issue here, which was Connections Training Center at 10 o'clock on October the 27th, 2008. This is where Hopkins has some problems. Not only that, Your Honor, but Hopkins testified about the fact that Mr. Smith was partying with him and Watson at a bar later that night when the records definitively showed as of 4.22 p.m. he is inside Kintock. Back in Kintock. Yes. Now, the government could, I mean, as I pointed out in my brief. You see, this is where that kind of hurts your argument in the sense that he was back at Kintock. So if he had left, there would be an incident report. If they knew about it. If they knew about it. Well, I understand that, but one of the points is that there were so many avenues of impeachment for the government to take here, which included the fact of Mr. Guyon being cross-examined about the security arrangements of Kintock and whether or not people could come and go or whether or not there was ability for Mr. Smith to leave. And that was fair game. Without a doubt. And a good alibi defense. Excellent alibi defense. And the question becomes here is whether or not these extraneous matters that went directly to the type of man he was as opposed to his whereabouts on a particular date and time, whether or not that tips the scales. Judge Ambrose's question, we have to return to that, don't we? Really. How was he prejudiced by the introduction of this stuff? How was it harmless error? Because, you know, whatever problems I may have with Hopkins, the jury convicted, there's not any, you know, it's not for us to make credibility determinations. See, Governor of Virgin Islands v. Giroir, one of my husband's cases. We can't do that. We have to look at the evidence in the light most favorable to the government and every inference. And, yeah, the jury did what it did. Your Honor, what speaks volumes here is the absence of any analysis in the government's brief as to why this was harmless error. The fact of the matter is is that you have an identification made by a witness, Tyrone Jenkins, which is made over two years after. That's if we get to reliability. But there's no real suggestion here that the procedure that was used was undue. You're right. I'm not going to touch on that. I'm talking about harmless error. Sure, you had an identification, but I think you have to take into account the circumstances behind the identification and the circumstances behind Omer Hopkins' motivations and testimony and things of that nature. I wonder, for one thing, Hopkins was arrested right after the robbery. Well, he's big. He's easy to find. Yeah, but nothing happened of which we are aware for two and a half years. And even though Mr. Smith's photograph was shown to him, he was unable to make a definitive identification. I see my time is up. Yeah, it is. Thank you, Your Honor. It's been a while. Good morning, Your Honors. May it please the Court? I'm Bernadette McKeown, and I represent the government today. McKeown, you pronounce it. McKeown, yes. I assume Your Honors would like me to start by addressing harmless error since that seems to be the case. Although you didn't brief it, did you? We did, Your Honor. We did at the end of our brief. We didn't go into a complete discussion of the evidence, but we pointed out. Isn't that the issue in this case? What page is it? At the very end of our brief, Your Honor. I'm on page 39. It's on page 40. Yes, we do. And we did so in a cursory manner, I will admit that. And that is because we believe that it's just inconceivable that there's a high probability that the jury convicted the defendant of an armed robbery based on evidence about petty, innocuous infractions. It's so petty. I mean, why? Wasn't this? You're loading up on this stuff here. This is early on. Your Honor, we don't concede that it was error to admit this evidence. And I don't know if you want to hear me explain why, but I'd like to take that opportunity. This wasn't introduced. This evidence that he had a history of violations at the facility was not introduced to show that he had bad character and he acted in conformity with that character. Why wasn't it introduced? It was offered for a specific purpose, and that was their alibi defense hinged on the jury accepting the fact that he was at Connections that day simply because he was required to be there, because that's what the rules of the facility, Kintock in particular, required him to be there. No, he was at Connections that day because he had signed out of Kintock, as he normally does, and someone observed him between 9 and 11 a.m., the person wasn't sure, at Connections. No, there's no question. Yes, there's no contention that he did not report to Connections that day. As the computer lab technicians testified, it was his practice, he opened his lab at 9, people arrived between 9.15, 9.30, he would check them off. On cross-examination, when he was asked about the time frame, he said he shut his log down at 11 a.m. So sometime between 9 and 11, he put a checkmark next to Mr. Smith's name. You know, Hopkins says he was picked up by Smith and Watson at 8 o'clock. Now, at 8 o'clock in the morning, and then they went to Rite Aid to buy gloves. That's correct, and that time frame fits, Your Honor. How does it fit? Because he checked out of... He didn't even sign into Connections. The earliest he signed into Connections was 9 o'clock, and it was any time between 9 and 11 that he signed in, and the robbery was committed at 10 a.m. So they had to... Your Honor, he left, he signed out of Kintock at 7 a.m., and then he travels to Connections. Then he has two hours before he has to be at Connections. That's a long period of time. So at 8 a.m., that's correct, Your Honor, but he very well could have... We don't know exactly when he was observed at Connections, but he was observed there, and then he could have left. As we know, they did nothing to monitor the attendance of people after they checked in. They had no physical restraints on people leaving the building. They didn't monitor their attendance. He could have walked out the door. The testimony was very clear about it. But he had to have walked out the door after 9 o'clock because he signed in somewhere between 9 and 11. I agree with that, Your Honor. So Hopkins was wrong when saying he was picked up at 8 o'clock. No, I believe he... Well, no, no, no, Your Honor. I think there's this two-hour gap where he very well could have picked up Hopkins. The right aid is 200 feet from Connections. He could have met him at 8 o'clock, gone to Connections, checked in, and left again. But Connections is 4 1⁄2 miles... From Fox and Hound. From the Fox and Hound, correct. Yeah. I mean, they would have had to be very, very efficient to get this done. But the time frame does fit, and my point is... Because there was... Don't leave time frame. Okay. Because he signs back into Kintock at 422. It's undisputed. And Hopkins has testified how they went out that evening and the streetlights were on. Right. Correct. And they celebrated, and they shared the money, split up the money. Okay? Yes, Your Honor. Hopkins did say that they met later on at a bar that night. I agree with that. Is there an incident report that shows that he left Kintock? No. No. No, there's not. However, the director of Kintock said, and he was frank when he said, well, you know, sometimes we'd have to catch them. Sometimes they maneuver around the security. I'm not suggesting that there's any evidence that he did so that night other than Hopkins' testimony. But if I could come back to the point about the introduction of the infraction evidence, that was because the only way, as I said, there was no witness saying he was there at 10 a.m. at Connections. There was evidence that he could have walked out the door. So the bottom line was that in order to accept the alibi defense, the jury had to believe that he stayed there because he was required to do so. And that's where the evidence about Kintock comes into play. Connections wasn't a secure facility. Kintock was. There had to be some incentive, motivation, et cetera, for the defendant to remain there. His state of mind was directly at issue. His state of mind was directly at issue? I believe so, Your Honor. His alibi was directly at issue. Well, his alibi depended on his willingness, his motivation, his intent to comply with those rules since there was no proof that he actually was there. So it all boils down to did he comply with the rules? The suggestion that was made by the introduction of the testimony about the rules and regulations was that he was subjected to a lot of rules and he complied with those rules. The government was entitled to rebut the inference that the jury could have drawn that he had, perhaps it was he was motivated by a fear of repercussions at Kintock. Whatever his motivation was, it was tied to his compliance with those rules. So how do these infractions, these 11 infractions, how specifically rebut the alibi defense? They go, the infractions show his alibi defense rested and turned on whether or not the jury believed he was there because he was required to be there. These infractions show that he did not respect the rules and regulations. His alibi defense was based? No, he wasn't there. He was in the middle of a talk. Finish your thought and I'll jump in later. The only two that go to what you just said occurred after October 22nd. But they weren't offered, I mean, those were probably the most relevant, yes, Your Honor, and they did occur afterwards. But it was important to show his history of noncompliance, not necessarily what they were, but the fact was that he totally disregarded the rules of this facility on many occasions. And it shows that it was directly intended to rebut the inference that the jury could have drawn that he was there because he was required to be there. And that makes it? His alibi defense was he was there because he was there. And you can believe it or not believe it, but it has nothing to do with whether he obeyed the rules or disobeyed the rules. He was there because someone saw him there. And that, to his point of view, corroborates that he was there sometime between 9 and 11. I do not dispute that someone saw him there between 9 and 11, Your Honor. But if you review Mr. Dawson's testimony, or I forget, perhaps it was the lab technician, he then says, I don't know what he did after that. People come in, they print a resume, they leave. We don't monitor that. I don't know where he went after I checked. So basically you could show that he perhaps wasn't there. But what he did, for example, in November or February after this October incident, what's that got to do with anything? Your Honor, I think it is just relevant to show a lack of respect, a disregard for the regulation, for the rules of the facility. And we really believe that his alibi defense could not have succeeded. But they charge him. They found him. When he wasn't there, they know it. And there was an incident report filed as to the November leaving, and he was discharged from Kintac as to the following February. So doesn't that hurt your argument that he wasn't there, that he was there that day? No. The absence of an incident report, in other words, the fact that Connections didn't call them on October 27th and said he left, was fully explained by the testimony. They said they had no requirement to generate an absence report. They only did so on occasion, and they did so infrequently. So most of the time they just weren't – somebody checked in, they weren't watching. We have absolutely no evidence that he left Connections. The only evidence we have in terms of where he was at a particular time on that date, in terms of the records of the institutions, was he left Kintac at 7 a.m., he signed into Connections between 9 and 11 a.m., and he signed back into Kintac at 4.22 p.m. Yes, Your Honor, but Connections, again, the testimony of those witnesses established they had no enforcement procedures for attendance. But he had to have been done what you say he did before 10 a.m. When it is conceded, the robbery occurred. And he could have checked in close to 9 o'clock, walked out the door. They could have committed the robbery. They got to go to Rite Aid first. Well, they went to Rite Aid earlier. No, no, walk out the door, go pick up – what's his name? Go pick him up, drive to Rite Aid, buy the gloves, buy the duct tape, and rob the tavern by 10 o'clock. Your Honor, and I'm suggesting that the FBI agent testified that it only took eight and a half minutes to drive in heavy traffic. So they could have made it to the Fox and Hound fairly quickly. The Rite Aid is 200 feet away. But you've got to do all this other stuff. Eight and a half minutes to go four miles? That's what the testimony was. I wasn't sure exactly of the mileage, but his testimony was when he drove it. Four and a half miles, eight minutes. Not in Philly, but that's okay. I understand the testimony. You're right. But that was the testimony. I got it. And there was another point I wanted to respond to in your honors. Oh, the fact that you're saying there's no evidence that he left the facility, there is evidence. The fact that Hopkins says he committed a robbery with him. So there's evidence placing him outside the facility. We have an eyewitness, a victim of the robbery, identifying him in a photo spread. And in contrast to that, we – Why did it take Hopkins two and a half years? Why did it take – or is that a question? Oh, no, I actually made sure I went through the record for that, Your Honor. What happened was Hopkins was, I guess, very – they identified him very quickly. All three employees identify him in a photo spread within a short period of time of the robbery. They are then struggling to identify who A-Dub is. They identify Snipes, who was Kareem Watson, based on the description provided and his address. They were able to figure out who it was, so they then arrest Kareem Watson. The delay with A-Dub – at one point, the agent testified that he met with him several times. He got as much information as he could. He got the description. He got the name. He got – and Hopkins said he's living in a facility, and he gave a general neighborhood. That is exactly where Kintalk is. I assume he ID'd Smith from the photo array, or didn't he? Yes, Hopkins did, and he said that looks like him. He was shown a 2010 photo when he said that's him. How did Smith's picture get into the photo array? Well, no, he was just shown photographs, I believe. Hopkins was shown a photo of him, and he said that looks like him. The photo array was then prepared for the victim. How did Smith's picture come to be shown to Hopkins? Oh, it was shown to them as they finally got a break, and somebody called in. It's not in the record because it's yours. That's what the two-and-a-half years is all about. And I'm wondering about other things. I'm wondering about, you know, was this really an inside job? Well, it was, Your Honor, because Kareem Watson – Why did they swab Smith's cheek, just as a matter of – Jenkins' cheek? I don't know the answer to that, Your Honor. I mean – Where is Abe in all of this? Wait, wait, wait. I didn't understand your question about Jenkins, the victim? No, no, Jenkins, the victim. Jenkins, the victim. But they swabbed his cheek for comparative purposes. I'm just wondering if you know why. I don't know. I wasn't the trial lawyer. I'm sorry, Your Honor. I mean, I tried to get as speed on the record as I could. If I may, let me go back to the harmless error. You state the test correctly. Whether it's highly probable that evidence or error did not contribute to the conviction. How can we say that it's highly probable that this evidence of bad character did not contribute to the conviction if we disagree with you on the 11 infractions as to whether they violate 404? Well, first, starting with the nature of the infractions, Your Honor. We are talking about a failure – possessing a cell phone on two occasions, possessing a camera, failing to obey an order, and they were all – Not being at connections when he said – Smoking. Smoking. The judge carefully excluded the ones that actually had some – there was at least some hint that maybe there was criminal activity. Did the government suggest or the prosecution suggested an instruction to the court? Did they not here? Yes, Your Honor. There was an instruction included in our submission. But the court didn't do it. Yeah, and there was no objection to that. That was – the defense did not ask for it. So if the test is – in effect, the burden is on you now to show that it's highly probable that this evidence did not contribute to the conviction. I still don't know how I can say that. Your Honor, I think, number one, it's the nature of the infractions themselves. Nothing about his failure to comply with rules at a facility suggests that he's an armed robber. The two just aren't linked. I don't know why this stuff came in. I just don't know. I mean, ditto. But the point – it did come in, and it's harmless. It is definitely harmless. It's the same reason that it's not prejudicial. If it was so harmless, then why, on page 40, you've got one paragraph on this. First couple sentences, you state the test. Here, the undisputed testimony was not substantive evidence of his guilt but related only to his alibi. That goes back to another point that you made earlier. But, again, we disagree with you. So now we're into, while the evidence may have contributed to the jury's rejection of the alibi defense, it did not contribute to the conclusion that the government had proven beyond a reasonable doubt they committed the robbery, which was instead based on codependent and eyewitness testimony and law enforcement testimony about the investigation. That is it. One sentence. Your Honor, we had discussed the evidence so thoroughly in the beginning of the brief. I can sum it up. I mean, the evidence here – But here, you've got to show that it's highly probable that it didn't infect the – you know, that it's highly probable that they wouldn't have convicted or they would have convicted otherwise. And one sentence can't do it. I apologize for that, Your Honor. One sentence. But I'm here to answer that question. And the question is you really have to focus, as Judge Barry pointed out earlier, on the nature of these infractions. They are for innocuous things. They are for non-criminal activity. Somebody's lack of compliance with rules in a facility just has nothing to do with whether they are willing to go put a gun to somebody's head and commit a dangerous armed robbery. Let me ask one question here. I know your time is up. But one of the things that gives me some concern – and maybe I'm not – maybe I shouldn't – maybe this is not for us to be concerned about. But assuming you're right, I mean, assuming we're with you on the bottom line here that, you know, if there was prejudice, it was not substantial such that it weighed whatever minimal, if any, probative value. At the end of the day, the error, if any, was harmless. I totally agree with you. He got 360 months. Hopkins got 73. That's because he was a career offender, Your Honor. Yes, I guess that's right. And that's what drove his guideline range. And obviously, the judge – I don't have the sentencing transcript, but the judge didn't find any mitigating factors, and that warranted it at various. Hopkins was the guy who had the gun. I mean, I understand. We all know about your way of cooperation. I understand that. I don't know if you – I see my time is up. I would address the strength of the evidence if Your Honors want to hear from me, but no? Okay. Thank you. Thank you. I'm a great believer in the adage, less is more. So unless Your Honors have something to ask me, there's really nothing I can add to what the discussion has already been. Thank you. Thank you. Thank you. We'll take the matter under advisement.